STEPHEN WEAVER (SBN 262121)
WEAVER LAND LAW
12100 Wilshire Boulevard, Eighth Floor
Los Angeles, California 90025
Telephone: (310) 806-9212
Facsimile: (310) 943-2216
Email: stephen@weaverlandlaw.com
*Attorneys for Plaintiff*
FRIENDS OF MORONGO VALLEY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION (RIVERSIDE)**

| | |
|---|---|
| FRIENDS OF MORONGO VALLEY, a California nonprofit public benefit corporation,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF LAND MANAGEMENT; DOUG BURGUM, in his official capacity as Secretary of the Interior; DIRECTOR, BUREAU OF LAND MANAGEMENT, in his or her official capacity; STATE DIRECTOR, BUREAU OF LAND MANAGEMENT CALIFORNIA, in his or her official capacity; and FIELD MANAGER, BLM PALM SPRINGS–SOUTH COAST FIELD OFFICE, in his or her official capacity,<br><br>*Defendants.* | Case No.<br>______________________<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Administrative Procedure Act, 5 U.S.C. §§ 701–706; National Environmental Policy Act; National Historic Preservation Act; Federal Land Policy and Management Act) |

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. Plaintiff Friends of Morongo Valley brings this action to set aside the Bureau of Land Management's approval of the Morongo Canyon at Highway 62 Multi-Tenant Wireless Broadband Communications Site Project (the "Project"), together with the associated right-of-way authorization and the land use plan amendment adopted to permit it, on public lands administered by the Bureau of Land Management ("BLM") in Morongo Valley, San Bernardino County, California.

2. The Project authorizes construction of a nearly 200-foot multi-tenant lattice telecommunications tower, equipment buildings, backup generators, fuel storage, access-road construction, utility installation, and related infrastructure within the Sand to Snow Special Recreation Management Area ("SRMA"), in a landscape managed under the California Desert Conservation Area ("CDCA") Plan, as amended by the Desert Renewable Energy Conservation Plan ("DRECP"), for scenic, recreational, biological, and cultural resource values.

3. In approving the Project, BLM acknowledged that the facility did not conform to the governing Visual Resource Management ("VRM") Class II objectives applicable to the site. Rather than select a conforming alternative, BLM adopted a plan amendment downgrading the VRM classification to accommodate the proposed facility; approved a facility that does not conform to a mandatory DRECP conservation and management action requiring avoidance of special-status plant species within one-quarter mile of the site; relied on a materially revised "Alternative D" configuration introduced in the Final Environmental Assessment without renewed public review; narrowed the Area of Potential Effects under the National Historic Preservation Act so as to exclude reasonably foreseeable indirect effects on the historic Morongo Valley Inn

and the surrounding cultural landscape; and issued a Finding of No Significant Impact resting on incomplete baselines, deferred analysis, and unsupported assumptions.

4. Plaintiff seeks a declaration that Defendants violated the Federal Land Policy and Management Act ("FLPMA"), the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and the Administrative Procedure Act ("APA"); an order vacating the challenged Decision, the Finding of No Significant Impact, and the plan amendment; and preliminary and permanent injunctive relief restraining issuance of any notice to proceed and any ground-disturbing activity pending the agency's compliance with law.

**JURISDICTION AND VENUE**

5. This action arises under the APA, 5 U.S.C. §§ 701–706; NEPA, 42 U.S.C. § 4321 et seq.; the NHPA, 54 U.S.C. § 300101 et seq. (formerly 16 U.S.C. § 470 et seq.); FLPMA, 43 U.S.C. § 1701 et seq.; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. This Court has jurisdiction under 28 U.S.C. § 1331.

6. The challenged decisions constitute final agency action for which there is no other adequate remedy in a court and are subject to judicial review under 5 U.S.C. §§ 702 and 704. The land use plan amendment is not subject to further administrative appeal. The Director of the Bureau of Land Management resolved all protests to the proposed plan amendment on May 11, 2026, and that resolution is the final decision of the Department of the Interior. 43 C.F.R. § 1610.5-2(b). As to the right-of-way authorization, Sara Fernandez, Plaintiff's President and a member of Plaintiff, together with other appellants, timely appealed to the Interior Board of Land Appeals and timely petitioned that Board for a stay. On July 28, 2026, the Board denied the stay petition, confirmed that the Decision is in effect, and stated that appellants may seek judicial review of the Decision in federal court. Sara Fernandez, IBLA 2026-0180 (July 28, 2026). Because the Decision went into effect when the Board denied the stay petition and remains in effect pending completion of the administrative appeal, the Decision is

final agency action for the Department and is subject to judicial review under 5 U.S.C. § 704. 43 C.F.R. §§ 4.21(b)(2), 4.405(a)(3).

7. Venue is proper in this District under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States acting in their official capacities, the public lands at issue are situated in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

8. Assignment to the Eastern Division is proper under Local Rule 83-1.1.1 because the events giving rise to this action occurred, and the real property that is the subject of this action is situated, in San Bernardino County.

**PARTIES**

9. Plaintiff FRIENDS OF MORONGO VALLEY ("FoMV") is a California nonprofit public benefit corporation organized under the Nonprofit Public Benefit Corporation Law for public and charitable purposes. Its specific purpose is to protect and preserve the environmental, scenic, cultural, historical, ecological, recreational, and public-safety resources of Morongo Valley and surrounding public lands through advocacy, education, and lawful public-interest actions. FoMV's Amended and Restated Bylaws establish a class of Voting Members (referred to in this Complaint as "members"), who hold the right to vote for the election of its directors and are members within the meaning of California Corporations Code section 5056. To qualify, a Voting Member must reside in or own real property in Morongo Valley, or regularly use the surrounding public lands for recreational, scenic, scientific, educational, or conservation purposes. On September 1, 2026, by unanimous written consent, FoMV's Board of Directors admitted eighteen Voting Members, each of whom had submitted a signed written application consenting to membership. The bylaws authorize FoMV to retain counsel and to participate in judicial proceedings involving environmental protection, public lands, and cultural resources. FoMV's Board of Directors has

authorized this litigation on behalf of its members and reaffirmed that authorization in the same September 1, 2026 consent.

10. FoMV's members include residents of Morongo Valley and recreational users of the affected public lands who participated at every stage of the administrative process for the Project, including its President, Sara Fernandez, whose residence is approximately 930 feet from the approved tower site and within the foreground of her primary view corridor toward Mount San Jacinto and the surrounding wilderness ridgelines. Ms. Fernandez regularly views, photographs, and recreates within the affected landscape with her family from their residence and the surrounding public lands. Other members likewise reside within and adjacent to the Project's viewshed and use the surrounding public lands for hiking, photography, scenic enjoyment, wildlife observation, and appreciation of the area's biological and cultural resources. Plaintiff will support these allegations by declaration if standing is placed in issue.

11. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the federal department responsible for management of the public lands at issue. Defendant BUREAU OF LAND MANAGEMENT is the agency within the Department that approved the Project, the right-of-way, and the plan amendment. Defendant DOUG BURGUM is the Secretary of the Interior and is sued in his official capacity. The DIRECTOR of the Bureau of Land Management, the STATE DIRECTOR of the Bureau of Land Management for California, and the FIELD MANAGER of the BLM Palm Springs–South Coast Field Office are sued in their official capacities. Fed. R. Civ. P. 25(d).

**STANDING**

12. FoMV has associational standing to sue on behalf of its members. FoMV has members within the meaning of California Corporations Code section 5056, who hold the right under its bylaws to vote for the election of its directors. At least one member, Plaintiff's President Sara Fernandez, would have standing to sue in her own

right; the interests FoMV seeks to protect are germane to its organizational purpose; and neither the claims asserted nor the relief requested requires the participation of individual members. Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977); Summers v. Earth Island Inst., 555 U.S. 488, 498–99 (2009); Or. Advocacy Ctr. v. Mink, 322 F.3d 1101, 1112 (9th Cir. 2003).

13. FoMV's members use and enjoy the affected public lands for hiking, photography, scenic enjoyment, wildlife observation, and appreciation of the area's biological and cultural resources, and they reside within and adjacent to the Project's viewshed. Construction of a nearly 200-foot industrial tower and associated ground disturbance would injure those concrete, particularized aesthetic, recreational, residential, and conservation interests. Those injuries are actual rather than conjectural, are fairly traceable to the challenged decisions, and would be redressed by the relief sought. Lujan v. Defs. of Wildlife, 504 U.S. 555 (1992); Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167 (2000).

14. FoMV's claims are procedural in substantial part. NEPA's requirements of accurate baseline analysis, evaluation of reasonable alternatives, and public review; Section 106's requirements of identification and consultation; and FLPMA's planning and conformity requirements are procedures designed to protect the concrete scenic, recreational, residential, biological, and cultural interests of FoMV's members. Where a plaintiff asserts a procedural injury, the standards of causation and redressability are relaxed: the plaintiff need show only that it possesses a procedural right that, if exercised, could protect its concrete interests, and that requiring the agency to observe the correct procedures may influence the agency's ultimate decision. WildEarth Guardians v. U.S. Dep't of Agric., 795 F.3d 1148 (9th Cir. 2015). Had BLM observed those procedures, the analyses and alternatives the procedures require could have altered the Decision, and the existence of other contributing causes of the injury does

not defeat redressability. Plaintiff separately alleges substantive injury from Defendants' approval of a use that does not conform to the governing land use plan.

15. FoMV's members raised the issues presented here before the agency. Members, including Sara Fernandez, submitted scoping comments in 2022, comments on the Draft Environmental Assessment and the proposed land use plan amendment in 2024, and protests of the proposed plan amendment in 2026, and appealed the Decision to the Interior Board of Land Appeals. Sara Fernandez, IBLA 2026-0180. The Director of the Bureau of Land Management resolved all protests, and the Board denied the petition for stay on July 28, 2026. Each issue presented in this Complaint was raised with sufficient clarity to alert BLM to the substance of the objection, and, for the reasons stated in paragraph 6, administrative remedies have been exhausted notwithstanding the pendency of that appeal.

## GENERAL ALLEGATIONS

### A. The Project and Its Setting

16. The Project site lies on BLM-administered public lands approximately one-half mile northwest of State Highway 62 in Morongo Valley, San Bernardino County (APN 058412141; T. 1 S., R. 4 E., Sec. 32), within the Sand to Snow SRMA. The alternatives BLM considered but did not approve would also have occupied APN 058412137. The surrounding landscape is a largely undeveloped desert setting of open ridgelines and mountain backdrops, visible from nearby residences, scenic corridors, and recreation areas, and functions as part of a wildlife movement corridor connecting conserved lands.

17. BLM concluded that the Project footprint does not overlap mapped South Coast Missing Linkages ("SCML") corridors and relied on that non-overlap to find the Project consistent with the DRECP's landscape and habitat connectivity objectives. That conclusion rests on a mistaken premise about what the mapping depicts. The mapped linkage layer identifies unconserved gaps requiring protective action, and it

treats conserved public lands such as the Project site as already functioning components of the linkage network. Absence from the mapped layer therefore does not establish that the site lies outside the functional linkage, and BLM's contrary reading produced an inaccurate connectivity baseline.

18. The Final EA confirms the error in BLM's own words. It states that the biological study area overlaps the South Coast Missing Linkages model, that the BLM-administered land containing that study area "was not included in the model for unknown reasons," and that "it can be assumed that the Project's footprint would overlap with this linkage area if BLM-managed land had been included." That statement cannot be reconciled with BLM's responses to public comments, which denied any overlap and rested the Project's consistency with the DRECP's connectivity objectives on the absence of overlap. BLM elsewhere described the Project as adjacent to the mapped corridor boundary and cited the DRECP conservation and management action governing the siting of projects along the edges of mapped linkages, while declining to apply that action's siting and configuration requirements. The DRECP itself identified the source linkage design, directed that the relevant linkage designs be incorporated into the plan's connectivity baseline, and made the linkage figures implementation tools for that conservation and management action. The information necessary to understand what the mapped layer depicted was therefore contained in BLM's own governing plan.

19. The Project was reviewed in Environmental Assessment No. DOI-BLM-CA-D060-2020-0005-EA. It authorizes a multi-tenant wireless broadband facility, including a nearly 200-foot lattice tower, equipment buildings, backup generators, propane fuel storage, access-road construction, and utility installation. The Draft EA analyzed action alternatives at an initial location the administrative record identifies as Site 1. The Final EA introduced and approved Alternative D at a second location approximately 800 feet southeast, which the administrative record identifies as Site 2.

**B. The Visual-Resource Plan Amendment**

20. During review of Alternatives B and C, BLM's visual contrast rating worksheets identified strong contrast, skyline intrusion, and conditions under which the tower "may dominate" or "begins to dominate" the landscape, and BLM acknowledged the facility did not conform to the governing VRM Class II objectives. The Draft EA initially proposed amending the governing VRM Class II designation to Class III for those alternatives, but after public comments BLM revised the Final EA to require a Class IV amendment for Alternatives B and C. BLM then introduced and approved Alternative D under a separate amendment to VRM Class III. Rather than avoid the conflict, BLM adopted a plan amendment modifying the designation only to VRM Class III for the approved Alternative D site.

21. The administrative record does not adequately substantiate the differing VRM classifications applied to substantially similar project alternatives. The Final EA evaluated conformity against VRM Class III objectives, while BLM's Governor's Consistency Review request described the amendment as modifying the designation to VRM Class IV, the classification permitting major modification of the characteristic landscape. Although the Final EA analyzed Alternatives B and C under a proposed VRM Class IV amendment, it does not explain, through comparable visual analysis from the nearest affected residential viewpoints, why the newly added Alternative D warranted only a VRM Class III amendment or demonstrate that Alternative D conforms to VRM Class III despite visual effects similar in character to those that resulted in the Class IV determination for Alternatives B and C. All three alternatives involve substantially the same 196-foot lattice tower, located along the same ridgeline in a comparable scenic setting and in similar proximity to affected residences. The Final EA assigns the project area uniformly high visual sensitivity and expressly acknowledges that the relocation did not "change the degree of contrast ratings for any KOPs that Alternatives B and D have in common." Although Site 2 is approximately

800 feet from Site 1 and at a lower elevation, BLM did not adequately explain how those differences justified a less permissive VRM classification without evaluating comparable near-field viewpoints affected by the relocation. BLM's own responses to public comments confirm the inconsistency. Those responses state that Alternatives B and C would reclassify Site 1 from VRM Class II to VRM Class IV, that Alternative D would reclassify Site 2 from VRM Class II to VRM Class III, and elsewhere describe the amendment as changing the designation to "VRM Class III or VRM Class IV." BLM never reconciled those descriptions with the Class IV designation it reported to the State in its Governor's Consistency Review request. Although BLM attributed the differing classifications to the absence of views of Site 2 from KOPs 2 and 9, it did not establish through comparable near-field analysis whether Alternative D would produce similarly strong contrast from other affected viewpoints. Consequently, BLM failed to adequately substantiate its conclusion that Alternative D's visual impacts were consistent with the amended VRM Class III objectives.

22. The visual simulations relied upon for approval depicted only a minimally equipped lattice structure. Alternatives B and C contemplated four tenants and one equipment building, whereas Alternative D, as approved, provides for five tenants and two equipment buildings, doubling the equipment-building area and massing. Although the applicant's own Propagation Study analyzed an eight-tenant capacity and the Draft EA Plan of Development identified structural capacity for up to eight tenants, the Finding of No Significant Impact describes a five-tenant capacity. The simulations depict none of these configurations, understating the facility's reasonably foreseeable buildout and visual prominence. BLM's response to public comments asserted that updated simulations and additional discussion resolved the issue but never reconciled the foreseeable tenant buildout or changed tower geometry with the minimally equipped structure depicted in the simulations.

23. BLM evaluated visual contrast for Alternatives B and C from KOPs 2 and 9, approximately 1,610 feet and 950 feet, respectively, from the Site 1 tower, and concluded that the strong contrast at both viewpoints would require amendment to VRM Class IV. For the alternative it approved, BLM prepared no contrast worksheet or visual simulation from any viewpoint at a distance comparable to KOP 9, although the nearest residence lies approximately 930 feet from the approved Alternative D site. Instead, the nearest Site 2 viewpoints, KOPs 14 and 13, were approximately 1,290 and 1,390 feet from the tower, respectively, while at least six existing residences and six vacant residentially zoned parcels were located closer to Site 2 than KOP 14. KOP 13 was also at a higher elevation than nearer residences and depicted the tower partially obscured by vegetation, conditions that did not represent the unobstructed views available from those closer residences. An independent visual simulation submitted in a protest of the Final EA depicted the approved tower from the nearest residence, approximately 930 feet away, showing substantially greater skyline intrusion, an unobstructed view of the tower, and interference with the existing view of Mount San Jacinto. The independent simulation used the approved tower's coordinates, elevation, and dimensions, but unlike BLM's KOP 13 simulation, it depicted a five-tenant configuration from a nearer residential viewpoint, in the same viewing direction as KOP 13, that was unobscured by vegetation. During scoping, comments specifically requested additional Key Observation Points from the nearest residences and from nearby public trails, and BLM did not prepare those viewpoints. Because Alternative D was first introduced in the Final EA, the public had no opportunity to comment on its specific visual effects during the Draft EA comment period. The Final EA states that KOPs were selected based in part on public scoping comments and that the identification of KOPs forms the basis for determining visual impacts and VRM conformance. BLM stated elsewhere in its responses to public comments on the Draft EA that it selects Key Observation Points based on the

availability of public access, but public access does not explain the omission. The viewpoint BLM used for the Alternatives B and C contrast rating was itself a publicly accessible location on a public road, and publicly accessible vantage points at comparable and nearer distances exist along the public roads bordering the residences closest to the approved Site 2. BLM prepared no contrast worksheet or simulation from any of them. The resulting comparison relied on near-field viewpoints exhibiting strong contrast for Site 1 while omitting closer, unobstructed residential viewpoints for Site 2, despite having been presented with visual evidence of potentially comparable or greater contrast before issuing its decision.

24. BLM justified the relocation in part by stating that Alternative D "would lower the site's elevation by 30 feet and increase its distance from the nearest sensitive receptor by over 120 feet." The Final EA further asserted that the relocation would "more effectively screen the facility from view by most homeowners in the nearby neighborhood." However, the relocation primarily improved screening for residences along Paradise Avenue north of Site 1, while shifting the tower closer to residences north and east of Site 2. The Final EA did not comparably evaluate whether those residences would experience greater visual intrusion, notwithstanding the independent simulation depicting the approved tower from the nearest affected residence. BLM did not evaluate whether the relocation reduced visual impacts overall or instead transferred comparable or greater impacts to other residential viewpoints, including those documented in the protest submission. Although Site 2 sits at a lower elevation than Site 1, site elevation alone does not establish the tower's apparent height, skyline intrusion, or degree of contrast from affected viewpoints. Those effects also depend on the observer's elevation, distance, viewing angle, and surrounding topography. The relocation also moved the tower materially closer to the Highway 62 corridor, a change that alters the visual geometry from the scenic corridor and from the nearest residences alike, and BLM evaluated that change from no near-field viewpoint. The

Final EA acknowledges that Site 2 has a different viewshed and that the relocation did not reduce contrast ratings at KOPs common to both alternatives, while introducing visibility from additional KOPs 11 through 14. Without comparable near-field analysis, BLM lacked a reasoned basis for concluding that Alternative D conformed to VRM Class III or that its visual effects were materially different from those BLM had previously determined warranted a VRM Class IV amendment.

**C. The Materially Revised Alternative D and the Curtailed Public Process**

25. The Draft EA centered on Site 1 alternatives. After the Draft EA comment period, BLM introduced a materially revised Alternative D relocating the facility, accompanied by new visual simulations, new Key Observation Points, revised conformity conclusions, updated biological information, and revised impact analyses. These revisions altered the environmental analyses on which the agency ultimately relied. Although Alternative D materially changed the access-road alignment and became the basis for approval, BLM did not provide topographic mapping, an engineered road profile, grading information, or comparable technical information sufficient for informed evaluation of that revised design, despite comments specifically requesting topographic information and grading analysis to evaluate the resulting disturbance, visual effects, and environmental impacts. BLM did not circulate a supplemental draft document or provide a renewed comment period before approval. On information and belief, BLM told congressional staff in February 2025 that the relocated proposal would be "moved completely outside of the area of analysis" and "would be open for new public comments," yet BLM approved the relocated site without a new comment period. During the 2026 protest period, members of the public could not access the Final EA and the proposed plan amendment on BLM's ePlanning website. BLM's project manager acknowledged in writing on March 3, 2026 that BLM "had some internal issues with the site," and BLM did not extend or reopen the protest period despite a written request that it do so. The revisions were not limited to the

facility's location. After the comment period closed, BLM removed the applicant's purpose and need statement as inconsistent with the intent of the EA and eliminated the executive orders on which the Draft EA's need discussion had relied. BLM changed the analytical framework governing visual resources, stating in response to comments that its analysis rested on BLM Manual 8431 rather than the visual resource inventory manual commenters had invoked, and revising Section 3.7 accordingly. BLM changed its cumulative effects methodology after publication of the Draft EA. BLM also removed the environmental justice analysis from the Final EA in its entirety. BLM circulated none of these revisions for public comment before approving the Project.

**D. Historic and Cultural Resources**

26. BLM received detailed information identifying the Morongo Valley Inn as a historic property proposed for listing in the National Register of Historic Places, located within the Project viewshed and approximately 0.37 mile from the approved tower site, together with nomination materials documenting its significance and setting. BLM received that information repeatedly before the Decision, including through a November 22, 2024 notice of intent to nominate the Inn, a January 30, 2025 submission following an onsite meeting with tribal representatives, an April 1, 2026 submission during the Governor's consistency review, and a May 7, 2026 submission transmitting the completed National Register nomination and annotated viewshed maps. The Final EA nonetheless states that the Inn is "approximately 1 mile from both Project sites," is "outside the APE," and "has not been formally documented." BLM defined the Area of Potential Effects to track the footprint of direct disturbance and did not meaningfully evaluate reasonably foreseeable indirect effects on the Inn's historic setting, feeling, association, cultural landscape, and viewshed during its Section 106 review.

*-this space intentionally left blank-*

**E. Biological Resources, Wildfire, and Deferred Analysis**

27. BLM's own 2025 Biological Evaluation defined the Alternative D biological study area using a 0.25-mile buffer surrounding the proposed disturbance and documented special-status plant occurrences within the Alternative D study area, including Latimer's woodland-gilia and Joshua tree poppy, while identifying additional special-status species with moderate-to-high potential to occur. During the administrative process, the California Native Plant Society documented additional special-status plant and reptile occurrences in and around the biological study area during May 2025 field surveys and submitted photographs, mapped coordinates, species identifications, and a plant list directly to BLM's biologist and project manager before issuance of the Final EA. BLM acknowledged receipt, but neither the Final EA nor the Biological Evaluation explains how those observations were evaluated or reconciled with its biological conclusions. The approved Alternative D footprint, moreover, was first added to the biological survey area only during a single-season May 2025 field effort, leaving the approved site with substantially less survey history than the alternatives studied throughout most of the environmental review. On April 17, 2026, four weeks before the Decision, the California Native Plant Society submitted to BLM's California State Director and the project mailbox a supplemental letter documenting 2026 occurrences of special-status plants, including Galium angustifolium ssp. gracillimum (slender bedstraw) within the proposed right-of-way, Linanthus maculatus (Little San Bernardino Mountains linanthus) within approximately 700 feet of the Project, and Chorizanthe xanti var. leucotheca (white-bracted spineflower) within approximately 800 feet of the Project. The administrative record does not explain how BLM evaluated the reported occurrences or reconciled them with its determination that the DRECP's 0.25-mile plant-avoidance setback was not applicable.

28. BLM responded to public comments in the same manner with respect to wildlife observations. Commenters submitted documented observations of special-

status species in the vicinity of the Project site, including observations of desert tortoise, a federally listed species, recorded within approximately two-thirds of a mile of the site. BLM responded that the observations were noted, that species observations had been taken into consideration, and that the potential for sensitive species occurrence had been updated as necessary in the Biological Evaluation and the Environmental Assessment. Neither the Final EA nor the Biological Evaluation mentions those observations or explains how they were evaluated. BLM’s stated response is unsupported by the documents to which it refers. The Final EA also does not establish whether BLM's analysis of desert tortoise impacts accounted for the full reasonably foreseeable disturbance associated with a professionally engineered access road or adequately considered the May 2025 juvenile tortoise carcass and local occurrence records.

29. The DRECP land use plan includes mandatory conservation and management actions, including a 0.25-mile avoidance buffer for special-status plant resources. The Final EA did not apply that buffer anywhere on the landscape and deemed it inapplicable because no qualifying resources had been identified, without reconciling that conclusion with BLM’s own Biological Evaluation or the additional botanical information contained in the administrative record. The Final EA’s own table of applicant-proposed measures contains the contradiction. Under the conservation and management action governing resource setbacks, the table states that no resources requiring setbacks have been identified. Two entries later, under the conservation and management action governing special-status plant surveys, the same table states that two special-status plants, including a BLM sensitive species, were documented within the study area during the 2025 survey effort. The Final EA then defers the 0.25-mile setback to preconstruction clearance surveys to be performed after approval, stating that setbacks will be implemented if special-status plant species are documented at that later stage. BLM thereby postponed to the post-approval period the determination whether a mandatory requirement of the governing land use plan constrains a project BLM had

already approved, even though BLM had detected qualifying occurrences within the study area, within the blooming period, and before the Decision issued.

30. Morongo Valley is a recognized wildfire "Community at Risk." The Project introduces generators, propane storage, and ignition sources into a fire-prone landscape, yet BLM did not perform site-specific wildfire-behavior modeling, evacuation analysis, suppression-capability or water-supply analysis, propane consequence modeling, or engineered access-road analysis, instead deferring these issues to future design and permitting. The record does not describe the authorized facility consistently. The approved Alternative D adds a fourth backup generator and a fourth propane tank to the three-generator, three-tank configuration analyzed in the Draft EA and carried forward for Alternatives B and C, and converts the facility from solar power to grid power. BLM nonetheless told commenters that its modeling assumed four generators while only three would be installed, offering that difference as a margin of conservatism, and then approved the one alternative that installs four. The Decision Record compounds the inconsistency by describing the authorized facility as including a single backup generator and a single propane tank.

31. BLM performed no propane consequence or thermal-exposure modeling, and it characterized the Project as "low risk" without reconciling that characterization with the acknowledged moderate-to-high wildfire hazard conditions and the concerns of the local community. BLM answered comments identifying the absence of consultation with local and state fire protection authorities by stating only that a Fire Management and Prevention Plan had been prepared and included in the Plan of Development. BLM identified no coordination with, and no concurrence from, the fire authority responsible for responding to the site. BLM further stated in response to comments that "[b]ecause the plan will be followed and the proposed Project presents low risk of wildfire, wildfire was not analyzed in detail in the EA." That rationale is circular. BLM treated the existence of a plan as the reason analysis was unnecessary,

while performing none of the site-specific fire behavior, suppression access, water supply, evacuation, or propane consequence analysis that would establish whether the risk is in fact low.

32. BLM's communications-use regulations and guidance, including 43 C.F.R. part 2860 and the Plan of Development provisions of 43 C.F.R. §§ 2804.12 and 2804.25(c), contemplate draft engineering and construction drawings and a Plan of Development sufficient to describe the proposed facilities. The administrative record contains no engineered road profile, grading plan, cross sections, or topographic mapping of the approved Alternative D access road. Responding to public comments that the access road must comply with San Bernardino County Fire Protection District Standard A-1, the applicant committed to engineering the road to satisfy Fire Protection District standards, and BLM adopted that commitment as mitigation and carried it into the Decision Record. BLM's approval therefore rests on a design commitment that the record does not demonstrate can be satisfied within the corridor BLM authorized.

33. BLM approved an unpaved access road extending approximately 885 feet from Canyon House Road to the tower site, ascending approximately 157 feet over that distance for an average grade of approximately 17.7 percent, more than double the 8 percent maximum that both Standard A-1 and BLM Manual MS-9113 permit for unpaved access roads. As public comments and the administrative protest before the agency demonstrated, achieving the applicable maximum 8 percent grade would require lengthening the access road to approximately 1,963 feet, more than twice the length of the approved alignment. A compliant road of that length would in turn exceed the 1,000-foot maximum length that Standard A-1 permits for dead-end fire-apparatus access roads. Because the horizontal distance between Canyon House Road and the tower site is substantially shorter than the road length necessary to satisfy that maximum grade, any compliant alignment would necessarily require additional curvature through switchbacks or comparable design modifications. In the steep terrain present at the site,

those modifications could require substantial cuts, fills, drainage crossings, or retaining structures, the feasibility and environmental consequences of which cannot be evaluated without the engineered grading plan, geotechnical investigation, and site-specific soils analysis that BLM expressly deferred until after approval. The approved alignment also exceeds the threshold at which applicable fire-access standards require a turnaround, yet the Final EA does not demonstrate how the required turnaround could be accommodated within the 50-foot right-of-way.

34. BLM acknowledged the analytical gap in its responses to public comments, stating that “the EA does not include slope analysis or a geologic study for the road alignment and grading plan,” while asserting that its impact conclusions were “based on the available data, with appropriate mitigation and remediation measures addressed as necessary.” Responding to comments documenting natural slopes along the alignment as steep as 51.9 percent, BLM stated that the Project “will address steep terrain and road alignment challenges by developing an engineered road design that complies with BLM and San Bernardino County Fire Protection District Fire Code standards.” BLM thereby promised future compliance rather than demonstrating compliance on the record before it. The administrative record does not describe the approved road consistently. The Final EA, the Plan of Development, and the Decision Record describe a 20-foot-wide road within a 50-foot right-of-way with up to 30 feet of cut and fill, including drainage, on either side, dimensions that total 80 feet and cannot be accommodated within the corridor BLM authorized. BLM’s responses to public comments describe the same feature differently, as a 24-foot-wide gravel access road with 13 feet of cut and fill, including drainage, on either side, totaling 50 feet in width. BLM never reconciled these descriptions. Because the width of the roadway and the permissible extent of cut and fill determine the disturbance the road will cause, the Finding of No Significant Impact rests on a facility BLM described in two mutually inconsistent ways and engineered in neither.

35. Reconciling these multiple design constraints would require revisions to the conceptual road geometry and site-specific geotechnical engineering to determine the cuts, fills, drainage features, manufactured slopes, retaining structures, and resulting disturbance necessary to construct the road, thereby potentially requiring substantially greater ground disturbance and associated visual impacts than the Final EA evaluated. BLM did not provide an engineered alignment or grading plan prepared by a licensed professional engineer, as BLM's own Manual MS-9113 specifies, and instead deferred the road's design to a post-approval phase, basing its soil-resource analysis on a geographically near sandy floodplain soil unit as a proxy for the unmapped, steep, and rocky conditions along the alignment. Nor did the administrative record include any topographic mapping of the approved Alternative D access-road alignment or lease area. Despite repeated public comments identifying topography as necessary to evaluate grading, disturbance, and environmental impacts, the Final EA omitted topographic mapping of the approved Alternative D lease area and road alignment altogether, leaving BLM without a basis to determine the road's actual longitudinal profile, grading requirements, earthwork, drainage, manufactured slopes, or resulting disturbance footprint before issuing the FONSI. Because the disturbance footprint depended upon engineering that remained incomplete, BLM lacked an evidentiary basis for concluding that Alternative D represented the environmentally preferable configuration or minimized surface disturbance. BLM confirmed the limits of that approach in its responses to public comments. BLM stated that the Natural Resources Conservation Service gives no general slope for the soil unit actually mapped at the site, which BLM described as rock outcrop; that the EA relied instead on data for a Cajon loamy sand unit mapped nearby; and that "no field investigations were made to classify the soil map units as a part of this planning process," such that the general characteristics given for those units, including slope, "may not exactly match current conditions at the Project sites."

36. Although the Final EA presents Alternative D as disturbing 1.20 acres, the accompanying Final Plan of Development states that "the road alignment is not a surveyed alignment" and that the disturbance area "does not take into consideration any potential cut or fill slopes." The same Plan of Development describes construction as involving the leveling of existing 1- to 3-foot berms while elsewhere acknowledging that the road may require up to 30 feet of cut and fill. These acknowledgments demonstrate that the disturbance associated with the final engineered road remained undefined, yet the Final EA relied upon that disturbance estimate in concluding that Alternative D minimized environmental impacts. Because the administrative record does not demonstrate that the approved 50-foot right-of-way could accommodate standards-compliant access road design and grading on steep slopes, and because the administrative record acknowledges the engineered design remains to be developed, the Final EA's disturbance footprint, its Area of Potential Effects, and its visual analysis all rest on a conceptual access-road alignment whose final engineered configuration and resulting environmental impacts remained unknown. The record is likewise inconsistent as to the road's length. The Decision Record authorizes an access road approximately 790 feet long, while the Plan of Development figure depicts an alignment of approximately 885 feet. Because the starting and ending elevations do not change, the shorter figure yields the steeper average grade and the larger compliance gap. Neither figure corresponds to a surveyed or engineered alignment.

37. The Project generated substantial public participation, including approximately 180 scoping submissions, 211 submissions on the Draft EA and plan amendment, and more than 1,000 substantive comments concerning visual resources, biological impacts, wildfire risk, recreation-setting conflicts, cultural resources, alternatives, and land use plan consistency.

38. BLM thereafter issued a Finding of No Significant Impact and approved the Project, the plan amendment, and the right-of-way authorization (collectively, the

"Decision") on or about May 15, 2026. The applicant accepted the right-of-way lease issued under the Decision on September 8, 2026, and BLM executed that lease on October 27, 2026.

**F. Irreparable Harm**

39. The Decision and the lease authorize ground-disturbing implementation, including grading, access-road construction, vegetation removal, excavation, utility installation, and erection of a permanent, nearly 200-foot tower, within a currently undeveloped desert landscape. Once those activities occur, the resulting cut slopes, disturbed soils, tower foundations, utility corridors, skyline intrusion, habitat fragmentation, and alteration of the historic and scenic setting cannot meaningfully be restored to preconstruction conditions, and the scenic, recreational, biological, and cultural values that FoMV was organized to protect will be irreparably injured. Environmental injury of this character can seldom be adequately remedied by money damages and is often permanent or at least of long duration. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Removal of the authorized facilities at the conclusion of this litigation would not restore the site. The Decision authorizes excavation of a 38-by-38-foot, six-foot-deep concrete tower foundation and cut and fill along an access road ascending steep terrain mapped in part as rock outcrop. Excavated landform, graded or blasted rock, and the desert soils and vegetation communities destroyed by that work cannot be reconstructed by removing the structures placed upon them, and recovery of disturbed desert soil surfaces and vegetation in this setting is prolonged and, as to landform, permanent. The availability of eventual removal therefore does not make the injury reparable.

40. No stay restrains implementation. The Decision and the FONSI do not prohibit implementation, and no judicial or administrative stay is presently in effect. On July 28, 2026, the Interior Board of Land Appeals denied the appellants' petition to stay the Decision pending administrative appeal and confirmed that the Decision is in effect.

Sara Fernandez, IBLA 2026-0180 (July 28, 2026). The applicant now holds an executed lease. The lease requires BLM's written authorization before construction or surface disturbance begins, and on information and belief, BLM may issue that authorization without public notice. Once it does, the applicant may commence ground-disturbing work upon obtaining the remaining County approvals. Should implementation become imminent before this Court can review the legality of the Decision, Plaintiff will seek preliminary injunctive relief. If construction proceeds before review is completed, the relief Plaintiff seeks may be substantially impaired or rendered ineffectual.

**G. The Balance of Equities and the Public Interest**

41. The balance of equities and the public interest favor preliminary relief. The injury is permanent and irreparable, whereas the harm to Defendants and the applicant from preserving the status quo during review is, at most, a temporary and primarily economic delay, particularly because the record reflects that substantial engineering, design, fire-protection, and access-compliance work remains before implementation may lawfully proceed. The public has a strong interest in ensuring that federal agencies comply with FLPMA, NEPA, and the NHPA before authorizing irreversible alteration of public lands managed for scenic, recreational, biological, and cultural values, an interest underscored by the extraordinary public participation this Project generated. Where, as here, plaintiffs raise at least serious questions going to the merits and the balance of hardships tips sharply in their favor, preliminary injunctive relief is warranted. *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011).

**DECLARATORY JUDGMENT IS NECESSARY**

42. There is an actual and present controversy between the parties. Plaintiff contends that the Decision, the Finding of No Significant Impact, the right-of-way authorization, and the land use plan amendment violate FLPMA, NEPA, the NHPA, and the APA, as alleged above. Defendants deny these contentions. Plaintiff desires a

judicial declaration that the challenged actions are unlawful and must be set aside. A declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and obligations, and Plaintiff should not be required to suffer the irreparable alteration of the public lands and resources at issue while that controversy remains unresolved.

## INJUNCTIVE RELIEF IS NECESSARY

43. Plaintiff is presently and continuously threatened with injury by Defendants' approval of the Project and the prospect of ground-disturbing implementation, insofar as the challenged actions violate FLPMA, NEPA, the NHPA, and the APA. If Defendants are not enjoined by this Court, they may issue a notice to proceed and authorize construction that would irreparably alter the scenic, recreational, biological, and cultural resources on which Plaintiff's members depend before the legality of the Decision can be reviewed. Plaintiff has no plain, speedy, and adequate remedy at law. The threatened injuries are to environmental, aesthetic, and historic resources that, once lost, cannot be adequately remedied by money damages and would not be fully redressed by any subsequent judgment.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

*(FLPMA & APA — Nonconforming, Project-Driven Plan Amendment)*

44. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

45. FLPMA requires that authorizations conform to the governing land use plan and that plan amendments advance resource-management objectives. 43 U.S.C. §§ 1712, 1732(a); 43 C.F.R. § 1610.5-3. A visual-resource classification may not be amended simply to accommodate a particular applicant's project without reasoned land-use planning consistent with FLPMA's planning objectives. *Quechan Tribe of the Fort*

*Yuma Indian Reservation v. U.S. Dep't of the Interior*, 2012 U.S. Dist. LEXIS 164353, at *6–7 (S.D. Cal. 2012).

46. BLM amended the VRM classification to accommodate this Project, did not demonstrate that the amendment was supported by independent planning objectives, and did not demonstrate that the approved facility conforms to the continuing Sand to Snow SRMA and DRECP objectives that BLM left in place. BLM likewise failed to demonstrate that the approved Alternative D conforms to the amended VRM Class III designation, relying instead on visual analyses that omitted comparable residential viewpoints and failed to explain why Alternative D warranted a less extensive downgrade of VRM classification than the Site 1 alternatives that BLM ultimately determined required a VRM Class IV amendment. The Decision is therefore arbitrary, capricious, and not in accordance with law under 5 U.S.C. § 706(2). See *San Juan Citizens All. v. BLM*, 326 F. Supp. 3d 1227 (D.N.M. 2018); *Hammond v. Norton*, 370 F. Supp. 2d 226, 245 (D.D.C. 2005). Because BLM's own record concedes that the facility does not conform to the governing VRM objectives absent the amendment, vacatur of the plan amendment would leave no lawful basis for the approval, which must also be set aside.

## SECOND CLAIM FOR RELIEF

*(FLPMA & APA — Unnecessary or Undue Degradation; Undue Impairment of CDCA Lands)*

47. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

48. FLPMA requires the Secretary to prevent unnecessary or undue degradation of the public lands, 43 U.S.C. § 1732(b), and to prevent undue impairment of the CDCA, 43 U.S.C. § 1781(f). Approval of an industrial facility and associated ground disturbance on lands managed for scenic, recreational, biological, and cultural values, without first undertaking the analysis necessary to ensure those sensitive values

are not significantly diminished, violates these duties and is arbitrary and capricious under 5 U.S.C. § 706(2). The Project's access road illustrates the violation. BLM's own engineering standards, set forth in Manual MS-9113, provide that roads constructed by nongovernmental entities across public lands be designed by or under the direction of a licensed professional engineer to satisfy applicable engineering, grade, safety, and resource-protection standards. By granting a 50-foot right-of-way for an access road without demonstrating that the road could satisfy those standards within the authorized corridor and approved configuration, and by deferring the engineered design and access-compliance analysis to a later phase, BLM authorized ground-disturbing use without first ensuring against unnecessary or undue degradation, in further violation of 43 U.S.C. § 1732(b) and § 1781(f).

**THIRD CLAIM FOR RELIEF**

*(FLPMA & APA — Nonconformity with Mandatory DRECP Conservation and Management Action)*

49. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

50. FLPMA requires that authorizations and uses of the public lands conform to the governing land use plan. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3. The DRECP, which amends the CDCA Plan, imposes mandatory conservation and management actions that BLM may not disregard, including a conservation and management action requiring application of a one-quarter-mile resource setback measured from occurrences of special-status plant species. A use that does not conform to a mandatory conservation and management action is not authorized under FLPMA, and BLM's approval of such a use is arbitrary, capricious, and not in accordance with law under 5 U.S.C. § 706(2).

51. BLM's own 2025 Biological Evaluation documented special-status plant occurrences within the study area, including Latimer's woodland-gilia and Joshua tree

poppy, and the California Native Plant Society documented special-status plants, including white-bracted spineflower and slender bedstraw, within the Project vicinity during the 2025 and 2026 blooming seasons. BLM nonetheless deemed the one-quarter-mile avoidance requirement “not applicable” on the stated ground that no qualifying resources had been identified, despite documenting qualifying special-status plant occurrences within the biological study area, which includes a 0.25-mile buffer. Neither the Final EA nor the Biological Evaluation explains why those documented occurrences did not trigger application of the mandatory avoidance buffer measured from the occurrences themselves rather than from the proposed disturbance footprint. The Final EA states in the same table both that no resources requiring setbacks have been identified and that special-status plants were documented within the study area during the 2025 survey effort.

52. The Final EA instead deferred the setback to preconstruction clearance surveys to be conducted after approval. Deferral does not satisfy a mandatory requirement of the governing land use plan. BLM detected qualifying occurrences within the study area, within the blooming period, and before the Decision issued, yet the record contains no analysis of whether a 0.25-mile setback drawn around those documented occurrences can be reconciled with the approved footprint. If the required setback cannot be reconciled with the approved footprint, the Project does not conform to the governing plan, and no post-approval survey can cure that nonconformity. Because the approved facility does not conform to a mandatory provision of the governing land use plan, and because that nonconformity cannot be cured by additional environmental analysis, the Decision and the right-of-way authorization violate FLPMA and must be set aside under 5 U.S.C. § 706(2). Plaintiff pleads this claim in addition to, and in the alternative to, the hard-look allegations set forth below.

*-this space intentionally left blank-*

**FOURTH CLAIM FOR RELIEF**

*(NEPA & APA — Failure to Take a Hard Look; Unlawful FONSI)*

53. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

54. NEPA requires a hard look at environmental consequences using accurate baselines and reasoned analysis, and an EIS where substantial questions exist as to whether a project may significantly affect the environment. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998). Agency action resting on inaccurate baselines is arbitrary. *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 495 (9th Cir. 2014).

55. BLM's FONSI rests on incomplete baselines, an unexplained refusal to apply mandatory DRECP conservation measures, omitted wildfire analysis, deferred engineering analysis, unsupported engineering assumptions, and a failure to engage contrary expert evidence in the record. Hapner v. Tidwell, 621 F.3d 1239, 1244 (9th Cir. 2010). The Final EA approved a project that its own technical appendices do not analyze. BLM received substantive information before issuing the Decision, including expert reports, biological observations, and cultural resource information, but frequently failed to explain whether that information was incorporated, rejected, or otherwise evaluated in reaching its conclusions. After BLM released its resolution of the plan-amendment protests on May 11, 2026, Plaintiff's President promptly transmitted independent RF-propagation and wildfire-safety expert reports to BLM on May 14, through the project manager, California State Director, and project mailbox. The reports corroborated technical objections previously raised during the protest process rather than introducing new issues. The Decision Record and FONSI issued the following morning do not address or reconcile those analyses. On May 18, 2026, BLM's project manager acknowledged both submissions in writing and stated that BLM would

"keep the information as part of the project record." In subsequent administrative-record proceedings, BLM acknowledged that the May 14 transmittals of both expert reports had been considered but inadvertently omitted from the administrative record. Despite acknowledging consideration of the reports, BLM has identified no contemporaneous substantive evaluation of their findings before issuing its Decision and has not explained how the previously raised technical deficiencies they corroborated were resolved.

56. Because the final engineered access road remained undefined, BLM necessarily lacked the information required to evaluate the Project's actual grading, earthwork, disturbance footprint, drainage features, erosion potential, wildfire access, and visual effects before issuing its Finding of No Significant Impact. The unresolved engineering was not merely a matter of construction detail; it determined the scope of disturbance, grading, drainage, and visual alteration upon which the Finding of No Significant Impact depended. BLM deferred the engineered design, grading plan, and disturbance analysis to a post-approval phase and based its soil-resource analysis on a geographically near floodplain soil unit rather than site-specific data, even though the EA's own dimensions establish that the proposed alignment is more than twice as steep as applicable standards permit and that a compliant alignment would substantially enlarge the area of ground disturbance. An agency may not defer to a later stage the baseline data and impact analysis necessary to support a finding of no significant impact. N. Plains Res. Council v. Surface Transp. Bd., 668 F.3d 1067, 1083 (9th Cir. 2011); S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior, 588 F.3d 718, 726 (9th Cir. 2009); Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993–94 (9th Cir. 2004).

57. BLM relied on operational noise modeling derived from 2021 analyses without demonstrating that the modeling remained representative of the materially revised Alternative D configuration ultimately approved. Alternatives B and C and the approved Alternative D differ in location, power source, generator count, and

operational assumptions, yet the Final EA carried the same 2021 modeling inputs, references, and calculated noise levels across all of them without explanation. The accompanying noise contour figures are not centered on either the original Site 1 alternatives or the approved Site 2, further indicating that the figures were not regenerated to represent the alternatives evaluated. The noise analysis further rests on a receptor distance that corresponds to no alternative BLM evaluated. The Final EA's noise tables use a distance of approximately 792 feet to the nearest residence east of the tower site, a figure that matches neither the distance from Site 1 nor the distance from the approved Site 2, and commenters identified that error during the Draft EA comment period. BLM invoked the San Bernardino County noise standard, which measures noise at the property line of the nearest site occupied by, zoned for, or designated to allow noise-sensitive land uses, and then applied that standard to a structure-to-structure distance rather than to the property lines the standard identifies. BLM thus measured operational noise against neither the correct receptor nor the standard it invoked.

58. The agency therefore lacked the baseline information necessary to support its conclusions regarding minimized disturbance, fire-access compliance, visual effects, noise effects, soils, and erosion before determining that the Project would have no significant environmental impacts. The same failure of baseline and analysis extends to additional resources the EA addressed without adequate support, including air quality and fugitive dust, environmental justice and localized socioeconomic effects, visual impacts from the nearest occupied residences, scenic highway and Sand to Snow SRMA viewshed effects, and the absence of any existing-condition radio-frequency baseline against which the claimed coverage deficiency could be measured. Commenters raised each of these subjects during scoping, public comment, or protest, and BLM resolved none of them with the analysis NEPA requires. The unresolved questions preclude a finding of no significant impact and require an environmental impact statement. The FONSI is arbitrary, capricious, and contrary to NEPA and 5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF

*(NEPA & APA — Purpose and Need, Alternatives, and Connected Actions)*

59. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

60. NEPA requires an objective evaluation of reasonable alternatives and forbids defining purpose and need so narrowly as to foreclose them. Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1171 (10th Cir. 1999). BLM defined need around the applicant's proposal for a multi-tenant communications facility and relied on the applicant's propagation study to reject reduced-height and other reasonable alternatives, yet failed to reconcile the technical discrepancies identified during public review, including the absence of a demonstrated existing communications deficiency and inconsistencies regarding projected coverage, technical assumptions, and tenant capacity. NRDC v. U.S. Army Corps of Eng'rs, 399 F. Supp. 2d 386, 409 (S.D.N.Y. 2005). The Draft EA rejected reduced-height alternatives at Site 1 on the stated ground that they would not provide adequate coverage, yet the approved Alternative D has a tower-top elevation approximately 57 feet lower than a reduced-height alternative rejected on that basis. Commenters and protestants raised that discrepancy before the agency, and BLM did not resolve it. The applicant's Plan of Development accompanying the 2024 Draft EA represented that topographic and land-use constraints precluded other potential locations, yet BLM subsequently approved Alternative D approximately 800 feet from Site 1 and at a substantially lower elevation. BLM did not reconcile the relocation with those previously asserted site-selection constraints or evaluate reduced-height configurations at Site 2 using comparable propagation modeling.

61. BLM also failed to adequately evaluate existing and emerging infrastructure, including the in-progress California Middle-Mile Broadband Initiative

and the approved County CSA-70 TV tower replacement project, and failed to evaluate co-location and distributed deployment. Rather than evaluating whether these alternatives were reasonable, BLM repeatedly responded that it lacked authority to require use of Caltrans or non-BLM property, conflating its jurisdictional authority with its duty under NEPA to evaluate reasonable alternatives. BLM's own responses confirm the error. Answering comments that asked why co-location within existing utility rights-of-way on BLM-administered land was not viable, BLM acknowledged that it "manages ROWs it has granted," then declined to analyze co-location in detail on the ground that it could not require Caltrans to host the facility. The comments did not ask BLM to compel Caltrans. BLM answered a question the commenters had not asked and used that answer to avoid evaluating an alternative within its own authority. Although the Final EA discussed the County CSA-70 tower as an alternative, it relied on the existing tower's lack of broadband coverage rather than evaluating the capabilities of its approved broadband-capable replacement. The applicant's Draft EA Propagation Study included an Alternative F simulation showing substantial potential coverage of Morongo Valley from the County tower, notwithstanding remaining coverage gaps along Highway 62 through Morongo Canyon. That simulation was omitted from the Final EA Propagation Study, without a reasoned explanation for its exclusion or evaluation of the replacement facility's potential contribution to a combined infrastructure alternative.

62. During the public comment process, commenters specifically proposed a combination of existing towers, the approved CSA-70 replacement tower, and other communications infrastructure as a reasonable alternative to the applicant's proposed single-tower solution, arguing that the project's multiple stated objectives could be achieved through a combination of existing and planned facilities. BLM did not meaningfully evaluate that combined alternative. The Draft EA's Alternative F propagation simulation demonstrated that the County tower could potentially provide

substantial coverage of Morongo Valley, although coverage gaps remained within Morongo Canyon. Rather than evaluating whether the County tower, the California Middle-Mile Broadband Network, and other existing or planned infrastructure could collectively address the identified service deficiencies, BLM evaluated the County tower largely in isolation and did not explain why the combined alternative raised in comments and protests was infeasible or would fail to satisfy the Project's underlying objectives. BLM also failed to evaluate connected, cumulative, and reasonably foreseeable infrastructure as part of the same analysis, improperly segmenting the action. *Twp. of Bordentown v. FERC*, 903 F.3d 234, 248 (3d Cir. 2018); *W. Watersheds Project v. Matejko*, 468 F.3d 1099 (9th Cir. 2006). The Final EA identified several additional communications and broadband infrastructure projects within the Highway 62 corridor as reasonably foreseeable future actions, including pending federal rights-of-way for communications facilities and fiber infrastructure. Yet BLM did not adequately explain how the anticipated combined effects of those projects were evaluated or whether their planned capabilities affected the need for the proposed tower. Evidence submitted during the administrative process also identified a Spectrum fiber installation extending toward the BLM parcel and a planned connection to the tower, yet BLM did not evaluate whether that infrastructure was sufficiently interdependent with the Project to require evaluation in the same analysis. The alternatives analysis violates NEPA and 5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF

*(NEPA & APA — Failure to Recirculate the Materially Revised Alternative D)*

63. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

64. NEPA guarantees that relevant environmental information be made available to the public to inform the decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Where the action ultimately approved differs

materially from the proposal presented for comment, recirculation is required. See *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97 (D.C. Cir. 2014); *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301 (D.C. Cir. 2015). This recirculation duty arises from NEPA's statutory guarantee of informed public participation and from BLM's own NEPA implementing procedures and does not depend on any Council on Environmental Quality regulation.

65. BLM introduced the relocated Alternative D, with new visual, biological, and conformity analyses, in the Final EA without a supplemental draft or renewed comment period, depriving the public of meaningful participation. The Decision is procedurally deficient, arbitrary, and capricious under 5 U.S.C. § 706(2). The revisions extended beyond the facility's location. After the close of public comment, BLM removed the applicant's purpose and need statement, eliminated the executive orders on which the Draft EA's need discussion had relied, changed the analytical framework governing visual resources, changed its cumulative effects methodology, and removed the environmental justice analysis. Because the purpose and need statement determines the range of alternatives an agency must consider, revising it after the close of public comment deprived the public of any opportunity to comment on the framework that governed the decision BLM ultimately made.

## SEVENTH CLAIM FOR RELIEF

*(NHPA Section 106 & APA — Inadequate APE and Indirect-Effects Review)*

66. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

67. Section 106 of the NHPA, 54 U.S.C. § 306108, and 36 C.F.R. Part 800 require a reasonable and good-faith effort to identify historic properties and to evaluate direct and indirect effects, including the introduction of visual elements that diminish the integrity of a property's setting, feeling, or association. 36 C.F.R. §§ 800.4, 800.5, 800.16(d); *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1150 (D. Mont. 2004);

*CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 112 (D.C. Cir. 2006); *United Keetoowah Band of Cherokee Indians v. FCC*, 933 F.3d 728 (D.C. Cir. 2019); see *Sierra Club v. FERC*, 867 F.3d 1357, 1371–72 (D.C. Cir. 2017).

68. BLM defined the APE to track direct disturbance and excluded reasonably foreseeable indirect visual effects on the Morongo Valley Inn and the surrounding cultural landscape, despite nomination materials documenting the property's historic significance and setting. Although the Final EA evaluated visual effects using a Key Observation Point selected near the Morongo Valley Inn, neither the Section 106 consultation materials nor the Final EA identifies the Inn itself as a historic property requiring evaluation of indirect effects under 36 C.F.R. Part 800. Rather than evaluating views from the historic property itself, BLM relied upon a partially screened proxy viewpoint located farther from the Project than the Inn, thereby potentially understating the tower's apparent prominence and intrusion into the historic setting. The administrative record does not explain why that viewpoint was representative of views from the Inn or demonstrate that BLM analyzed how the proposed tower would affect the Inn's historic setting, feeling, association, or surrounding landscape. The State Historic Preservation Officer questioned BLM's APE rationale, requested evaluation of indirect visual and auditory effects beyond the area of direct disturbance, and required that consultation proceed under 36 C.F.R. Part 800 rather than the California Protocol, and requested that BLM provide any additional information received from Tribes, organizations, or other consulting parties concerning historic properties as consultation progressed. The administrative record does not demonstrate that BLM reconsidered its indirect-effects analysis after receiving the Morongo Valley Inn nomination materials or other subsequently developed information. In opposing the stay petition before the Interior Board of Land Appeals on June 29, 2026, BLM represented that it had "expanded the APE to include visual and auditory effects." That representation conflicts with BLM's own Section 106 consultation correspondence, which expressly states that

the APE was not expanded beyond the project footprint. Although the Final EA analyzed visual effects on the surrounding landscape under NEPA, the administrative record does not establish that BLM incorporated those areas into its Section 106 APE, consulted with SHPO concerning an expanded indirect-effects APE, or evaluated the effects of the undertaking on the historic characteristics of the Morongo Valley Inn. The APE mapping in BLM's December 2025 cultural resource survey addendum traces only the tower pads, the access and utility corridors, and the associated disturbance footprints, and BLM's November 2, 2026 administrative record production identifies no revised APE determination or map documenting the claimed expansion. Although BLM acknowledged that additional considered consultation materials were omitted and promised supplementation, the November 2 production did not resolve the discrepancy between its Section 106 correspondence and its representation to the Board.

69. The same identification failure independently affects the Project's access road. Because the final engineered access-road alignment had not yet been determined, BLM failed to demonstrate that the Area of Potential Effects adequately encompassed the reasonably foreseeable direct and indirect effects of the access road before completing Section 106 review. Public comments specifically warned that achieving compliance with applicable fire-access standards would likely require additional disturbance beyond the conceptual alignment, thereby expanding the Area of Potential Effects. Instead, BLM defined the APE around a conceptual alignment while simultaneously deferring the engineering necessary to determine the road's actual configuration and disturbance footprint. Because the final engineering remained unresolved, the administrative record does not establish whether achieving compliance with applicable standards would ultimately require additional grading, switchbacks, retaining walls, or other modifications that could alter the road's indirect and direct effects, leaving those effects outside the Section 106 analysis BLM completed. 36 C.F.R. § 800.4(a)(1). BLM thereby failed to make the required reasonable and good-

faith effort to identify historic properties and evaluate their direct and indirect effects, in violation of the NHPA and 5 U.S.C. § 706(2).

**EIGHTH CLAIM FOR RELIEF**

*(APA — Arbitrary and Capricious Agency Action)*

70. Plaintiff re-alleges and incorporates by reference each preceding paragraph.

71. For the reasons alleged above, the Decision, the FONSI, and the plan amendment are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and were adopted without observance of procedure required by law and must be held unlawful and set aside under 5 U.S.C. § 706(2)(A) and (D).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Declare that Defendants violated FLPMA, NEPA, the NHPA, and the APA as alleged;

B. Vacate and set aside all components of the Decision, the Finding of No Significant Impact, the right-of-way authorization, and the land use plan amendment, and remand to the agency for compliance with law;

C. Enter preliminary and permanent injunctive relief enjoining Defendants, their officers, agents, servants, employees, and attorneys, and any person in active concert or participation with them who receives actual notice of the order, from issuing or acting upon any notice to proceed and from undertaking any ground-disturbing or construction activity pending the agency's compliance with FLPMA, NEPA, and the NHPA;

D. Award Plaintiff its costs and reasonable attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

E. Grant such other and further relief as the Court deems just and proper.

Dated: November 21, 2026

*/s/ Stephen Weaver*

Stephen Weaver
WEAVER LAND LAW
*Attorneys for Plaintiff*,
FRIENDS OF MORONGO VALLEY